## TROTTI v. NATALBANY LUMBER CO., Limited.

### No. 1061.

Court of Appeal of Louisiana. First Circuit.
Dec. 6, 1932.

Kemp & Buck, of Amite, for appellant.

McCoy, Moss & King, of Lake Charles, and Taylor, Porter & Brooks, of Baton Rouge, for appellee.

MOUTON, J.

Plaintiff obtained judgment against defendant company for $8,000 in compensation under the Employers' Liability Act (Act No. 20 of 1914 as amended) for injury alleged to have resulted in total disability disqualifying him from doing any physical labor.

Defendant company appeals.

It is alleged by plaintiff that, while engaged in the service of the company, his foot caught in some grass or weeds, causing him to stumble with great violence on a railroad track of defendant company, which brought on "the dislocation of the sciatic nerve in his left hip"; that as a result of the fall he suffered a severe bruise and pain, but, thinking that the bruise was only slight, he continued on the two following days in the performance of his services; that the third day his pain was so acute that he consulted a physician, and learned from him that the injury would be permanent; and that it has since so proved.

This alleged fall occurred September 30, 1930. Dr. Thom, the record shows, is the physician who plaintiff consulted about three days after he had stumbled on the track.

Dr. Thom says, after this consultation, he saw plaintiff in his bed, and that he was complaining with acute pain, particularly in his left leg and hip. His primary impression, the doctor says, was that he had suffered a bruise of the hip, and that he had so reported. Further, the doctor testifies that he saw no black or blue marks on plaintiff, and prior to this statement says he did not see any objective symptoms on plaintiff, but that he appeared as suffering with excruciating pains. As plaintiff, according to this physician's testimony, had no marks, black or blue, and no objective symptoms, there could not have been any bruise or contusion, which always leave a discoloration of the skin or tissues. It must therefore have been a mere impression of the doctor, as he expresses it in his testimony, that led him to report a contusion; and this disposes of Dr. Thom's reference to plaintiff's injury as being severe, as there is nothing in his evidence to support that statement. The fact is that Dr. Thom further testifies that he gave plaintiff something to relieve his pain, that he could not determine what it was, and referred him to Dr. Williams of Baton Rouge for an X-ray picture. It is therefore apparent that Dr. Thom was at a loss as to what he could ascribe the pains his patient was suffering with, and therefore referred him to a specialist that the cause of the trouble might be ascertained. Hence the symptoms of the trouble with which plaintiff was suffering appeared only from the pains he was experiencing, and were therefore merely subjective, and it may be stated here that there were no bruises on plaintiff's body, as averred in his petition.

Dr. Thom testifies that the X-ray report indicated that plaintiff was suffering with hyperthropic arthritis of one of the bones in the hip, and that he could not make any intelligent reading of the X-ray. As plaintiff continued to suffer, Dr. Thom referred him to Dr. Guessener of New Orleans, an expert in such matters, so Dr. Thom testifies. Both of these physicians, the record shows, were in the employ of defendant company.

On the 14th of October, 1930, plaintiff was examined by Dr. Guessener in his office in New Orleans, to whom he had reported as directed by Dr. Thom. There were then no black or blue marks on plaintiff's body according to Dr. Guessener, and who says that for an indication of a recent injury a physician would expect to find what is called "technically eccymosis, which means black and blue marks." He explains that on grown persons the average time for the disappearance of such marks would be in ten or twelve days; in children sooner, and in older people as long as five weeks. At that time plaintiff was over fifty, and, as he fell on the track September 30, 1930, and was examined by Dr. Guessener October 14, 1930, these blue and black marks would have been seen by Dr. Guessener at the time of the examination had they been present. As a matter of fact, plaintiff does not testify that any such marks resulted from his fall, and, as there was no proof that any such existed, the allegation in plaintiff's petition that he had suffered a bruise has no support, although, according to Dr. Guessener, a physician would look for these black and blue marks for an indication of a recent injury to the hip.

The other allegation of plaintiff in his petition is that he suffered as a result of his fall a "dislocation of the sciatic nerve in his left hip." Dr. Guessener, being questioned on this subject, says: "There is no such condition that I know of as a dislocation of the sciatic nerve." The only disturbance of this nerve, Dr. Guessener says, is when it is "stretched near the sacro-iliac joint." As there was no proof that this sciatic nerve had been thus stretched or extended, and as no such disturbance as to its dislocation was known to Dr. Guessener, the allegation of the petition in reference thereto must also be disregarded from consideration.

The testimony having taken a wide range and without objection, we must look to other parts of the evidence to see if the proof

shows that there was a causal connection between the disability of which plaintiff complains, and the fall he alleges he suffered on the railroad track of defendant company on September 30, 1930.

Plaintiff testifies that he fell on that occasion, not on the rail of the track, but over the rail. There being no evidence to contradict that statement, we will accept is as true in proceeding to the analysis of the evidence.

It is admitted by plaintiff that he had fallen on his buttock in 1926, but in connection with that statement he says he had entirely recovered from its effects. Dr. Guessener testifies that, when he reported to him October 14, 1930, plaintiff told him he "sat on his left buttock hard on a cypress knee and had trouble ever since." Although plaintiff was recalled as a witness, he does not deny that he made that statement to Dr. Guessener. It will be noticed this injury he suffered in 1926 was on the left side of his rump, and that in his fall near the rail he complains of an injury to his left hip and leg.

Freiler, witness for defendant, superintendent of the Denkham Lumber Company, says he worked with plaintiff in the same company, and that plaintiff left "their" employ in 1924. In 1921 this witness says that plaintiff complained of suffering from his back and hip; remained home on account of this attack about a week, and about a year later was laid up, incapacitated, and several months afterwards was again incapacitated.

Connely, witness for defendant, says he has known plaintiff since April, 1930; that before September 30, 1930, plaintiff complained of rheumatism, and noticed that he limped at times; that plaintiff said there was something the matter with his hip, did not know what it was, but guessed it was rheumatism.

When recalled as a witness and questioned in reference to that statement of Connely, plaintiff says the boys would see him limping, would ask if he had rheumatism, and that he would reply, "No, I hurt myself"; that he never had rheumatism, and cannot account how Connely so concluded. His explanation admits, however, that he was limping.

The X-ray report of Dr. Williams, as before stated, was that plaintiff had hyperthropic arthritis, which Dr. Thom says laymen frequently call rheumatism. But Dr. Guessener says that there is a condition called hyperthropic arthritis "which is one form of rheumatism." Hence it would seem that this trouble often characterized by laymen as rheumatism is not at variance with the name given to it by men versed in medical science.

Dr. Guessener further testifies that he could not say "exactly" what was the trouble of which plaintiff complained; that he made up his mind he had a mild trouble about the left side of his pelvis which could have been due largely to his 1926 injury. It might have been, says the doctor, aggravated by his 1930 injury, if it were severe enough, and might have been in some way increased by some "toxic condition in him." In this diagnosis of Dr. Guessener, it appears that, although the injury plaintiff received in 1926 might have been aggravated by his 1930 injury, it could likewise have been increased by "some toxic condition in him."

It must be observed that an aggravation of his prior injury could have occurred "if it was severe enough," as is stated by Dr. Guessener. This injury of 1930 Dr. Guessener says, however, "was slight." There was not therefore a severe injury suffered by plaintiff in 1930, from which could have resulted an aggravation of the injury he suffered in 1926. If there occurred any increase in that way, it must be ascribed to some "toxic condition" in plaintiff's system, if we are to place any reliance on Dr. Guessener's diagnosis.

The allegations of plaintiff are that he caught his foot in some grass or weeds, stumbled and fell, not on the rails or cross-ties, but over the rails; there were no marks on his body resulting from this fall. It is shown that he was in bed a few days after this accident, and soon after resumed his work with defendant company, and worked with it from September, 1930, the alleged date of the accident, until February 1, 1931, when he severed his connection with defendant company. During the interval between the two foregoing dates, he performed his services equally as well as he had prior to the time of his injury, September 30, 1930.

Plaintiff says he was discharged from the service of the company on February 1, 1931, because he had employed an assistant, one Leon Jones, to help him out in his work; thus intimating that he was unable to perform his services as he had prior to his alleged injury.

Gully, the general logging superintendent of defendant company, testifies he did not know that Leon Jones was considered as an assistant to plaintiff, as he understood he was a utility man, and says the reason he discharged plaintiff was not at all because he had proved inefficient since his alleged injury, but because he was not giving the co-operation needed, and also for the reason that the company intended to move its logging operations from a swampy location to a hill country with which plaintiff was not familiar. It appears, besides, from other witnesses, that Leon Jones had been working under the orders of plaintiff in the same capacity before and after September 30, 1930.

As he had been working in a like capacity prior to the accident, there is no ground to justify the inference that he became an assistant to plaintiff after his injury to help

him out in carrying on in the work he was engaged to perform.

The conclusion must therefore be that plaintiff, after September 30th, was working to the full satisfaction of defendant company as he had done prior thereto, and consequently that his alleged injury, if he really suffered any, was extremely light, as was testified to by Dr. Guessener, and which could not have caused the disability of which he complains.

Plaintiff testifies that he came from Beaumont, Tex., in an automobile which he drove to Baton Rouge, where this case was tried. His testimony is that the pain in his hip was such that he had to get out on the way several times for relief. This trial took place in January, 1932, over a year after the alleged accident. Connely testifies that he saw plaintiff drive a Ford car before and after September 30, 1930, from Livingston Camp to St. Francisville as fast as it would go, and, as he described the drive, without apparent discomfort to plaintiff. This drive was not long after the date of the alleged accident, when it would seem that plaintiff's incapacity would have been apparent, and that the intense pains which could have resulted from his injury would have been more intense than they were a year after during his drive from Beaumont to Baton Rouge.

It is impossible from the foregoing evidence, and which embodies the facts essential to a proper solution of this case, to say that the disability of which plaintiff complains is traceable to his alleged injury of September 30, 1930. As far as the record discloses, it might have been the result of the rheumatism with which he suffered or to an increase of a toxic condition in his system or to some other ailment.

In the case of Wright v. Louisiana Ice & Utilities Co., 19 La. App. 173, 138 So. 450, 452, we had occasion to quote the familiar rule which governs in cases of this character, where the court said: "The burden is on the claimant to show by a preponderance of evidence, not only an accidental injury received, but that the loss complained of was caused by the injury."

It has been invariably held that the complainant must establish by a preponderance of the evidence a causal connection between the accident and the injury or resulting disability, which is another way of expressing the doctrine hereinabove quoted.

In this case there is no such proof, and the right of plaintiff to recover rests altogether on conjectures and possibilities upon which no judgment can be grounded, otherwise we would have to discard from consideration the rule which requires that the demand of the plaintiff be established with legal certainty.

Plaintiff having failed to meet this requirement, the judgment rendered in his favor is erroneous, and must be reversed.

It is therefore ordered and decreed that the judgment appealed from be annulled, avoided, and reversed; and that plaintiff's demand be rejected at his own cost in both courts.