## MOORE v. THOMPSON–RITCHIE GROCER CO. et al.

### No. 5027.

Court of Appeal of Louisiana. Second Circuit.

June 4, 1935.

R. W. Oglesby, of Winnfield, for appellant.

Thornton, Gist & Richey, of Alexandria, for appellees.

DREW, Justice.

In this case the learned judge of the lower court has rendered a written opinion which, we find from a careful study of the record, clearly states the issues, facts and law applicable thereto, which is that a plaintiff, even in a compensation suit, must make out his case by a preponderance of the evidence, and in this case the plaintiff has failed in that respect. We find no manifest error in the judgment of the lower court, so adopt it as the opinion of this court. It is as follows:

"Plaintiff sues for $7.80 per week, for 400 weeks, as compensation under the Employers' Liability Act (Act No. 20 of 1914, as amended) growing out of an alleged injury received on May 17, 1933, while performing services for and under employment by Ritchie-Grocer Company. Said company is a wholesale grocery concern domiciled at Camden, Ark., operating a branch place of business in the city of Alexandria, Rapides parish, La., under the then trade-name of Thompson-Ritchie Grocer Company. Said defendant company was insured at the time by the United States Fidelity & Guaranty Company, and both companies are joined as defendants.

"Plaintiff, on May 17, 1933, was, and had been for some five years, in the employment of said Ritchie Grocer Company as a truck driver, delivering groceries to various customers. While so engaged he had carried a load for delivery in the warehouse or storeroom of the United States Veterans' Hospital, near Alexandria; the load consisting of various and sundry groceries, among which was a 100-pound sack of sugar. It was late in the afternoon when he made the delivery. On said occasion, plaintiff alleges that he had backed his truck so that its rear end was down in the roadside ditch in front of the door of the warehouse, the floor of the truck being about a foot above the ground; that 'when he had the truck almost unloaded and while in the act of putting a 100-pound sack of sugar on his shoulders to place the same in the warehouse * * * he suffered a severe strain to his left hip, his lower abdomen and the small of his back in the sacroiliac region in which the muscles, ligaments and nerves were torn and disarranged to such an extent that he has been left permanently and totally disabled from doing work of a reasonable character.'

"Defendants, in answering, deny the accidental injuries alleged, deny any and all liability, and allege upon information and belief that, 'some time during May, 1933, plaintiff, as a result of a diseased condition, received treatment from and was examined by a physician, and that any disability which the said Charles L. Moore was then suffering from, or which he may have been suffering from subsequently, is entirely due to disease and natural causes. * * *'

"Suit was filed April 7, 1934. The plaintiff upon trial, November 8, 1934, testified that in lifting the sack of sugar to his shoulder a severe pain struck him in lower part of his back and extended to his left hip; that it was late in the evening and he finished unloading the truck of a few light articles remaining in it, drove it back to his employer's place of business in Alexandria, some few miles, caught a ride home with a friend in a car; that Mr. Thompson, manager of defendant company, had left his office when he (plaintiff) got back with the truck; that he suffered all that night, went next morning and told Mr. Thompson about his injuries, was directed and did go to the office of Simmons, Rand & Barber, defendant insurance company's physicians,

was questioned, but not examined by Dr. Barber, who prescribed some medicine; that he continued to use the medicine and go back and forth to the doctor for a week, when feeling better he went back to work, drove the truck three days, and had to quit work on account of the pain and suffering, and has been unable to do any work since; that he went back to the physicians and Dr. Barber then examined him and placed him in a cast.

"Dr. Barber testified that he examined plaintiff on May 18th; that plaintiff complained of pain in his groin, and said he thought he was ruptured, but Dr. Barber says he found no symptoms of rupture; that plaintiff told of having a few days prior, pains in the region of his prostate gland and thought it might have been caused by constant sitting on the seat of the truck and the jolting from the truck. Dr. Barber says, from plaintiff's complaints and statements, he was led to suspect the existence of a congenital disease; that he then examined plaintiff's urine, found pus and blood, evidencing congenital infection; therefore, concluded that to be the trouble and made out his report to that effect classing it as not an insurance case. Dr. Barber is still of the opinion that plaintiff's trouble was due to this infection and that same was not due to any injury plaintiff might have received on the occasion complained of.

"Dr. Rand testified that he also examined plaintiff during this period, found pus and blood in the urine, made an X-ray, and found no evidence of traumatic injury; therefore, was and still is of the same opinion as Dr. Barber.

"After the lapse of some days or weeks, plaintiff went to Dr. Texada for examination, was examined by him, and he came to the same conclusion as did the other two doctors. Dr. Texada testified that plaintiff gave a history of having had pains from penus to scrotum a few days prior to May 17, 1933, and of having had considerable fever shortly after that date, which indicated the existence of the infection. From Dr. Texada's examination he made the same diagnosis as Doctors Barber and Rand, and does not think plaintiff's alleged condition attributable to any accidental injury.

"At some time before or shortly after plaintiff was examined by Dr. Texada, he was examined by Dr. Scott, of Lecompte. Since Dr. Scott was not called to testify, his findings are not in the record. That examination, as the court understands, was at plaintiff's own solicitation. No explanation is given as to why Dr. Scott was not summoned to testify.

"Plaintiff, it appears, next called upon his own family physician, Dr. Bonnette, which was the latter part of June. Dr. Bonnette's diagnosis was that of some sort of 'trouble in the region of the sacro-iliac joint.' He could not tell just what it was, but thought it possible to have been caused by lifting the sack of sugar. He says 'it is almost impossible to pull or tear away the very strong muscles and ligaments in that region without carrying a part of the bone.'

"Plaintiff also went to Dr. Durham in that same month and was examined. Dr. Durham testified that plaintiff's urine was negative; that he had tenderness in the lower regions of the back, but could not determine the exact trouble. His ideas were practically the same as those of Dr. Bonnette.

"Other than the findings of the above-named doctors and plaintiff's own statements, there do not appear any objective symptoms.

"Mr. Williams, shipping clerk for the defendant grocer company, testified that plaintiff had always been a good workman. A Mr. Garrett testified also to this fact.

"A number of X-rays were taken, from which a number of radiologists testified. The sum total of this line of testimony, owing to such glaring conflict, almost bewilders the court. Dr. Rand took one in June, 1933, from which he, Dr. Texada, Dr. Barker, and Dr. Barber, testified that no injury or disorder of the sacroiliac joint or bones in that region are shown; on the contrary, it showed a perfectly normal condition. Dr. Weinstein, in July, 1934, made one of the entire area of the eleventh dorsal vertebra to the extreme lower pelvis, which he testifies shows nothing abnormal in the urinary tract, kidneys, and bladder, but does show a definite subluxation and some inflammation of the left sacroiliac joint, and which in his opinion was caused by trauma, which is responsible for plaintiff's disability. Dr. Luther Stewart, testifying from this film, corroborates Dr. Weinstein in the main; however, he says that the film is most too dark to bring out clearly the conditions, and he is not absolutely positive as to the reading.

"As against the testimony of Doctors Weinstein and Stewart relative to this film, we have the testimony of Doctors Rand, Barker, and Texada, stating positively that the film reveals nothing whatever abnormal.

"Some few months just prior to the trial of the case, plaintiff and his attorney, Judge

Oglesby, carried the Rand and Weinstein films to Dr. Shimberg, a radiology and pathology expert at the United States Veterans' Hospital, near Alexandria, for an opinion. This doctor stated that these films did not give the proper view for a correct diagnosis and directed a lateral view be taken. Thereupon, plaintiff and his counsel went to Dr. Barker, a specialist in radiology and pathology of many years' experience and superintendent of the Baptist Hospital in Alexandria, who made a lateral view, as requested. When this film was presented to Dr. Shimberg, he then diagnosed the condition as spondylolisthesis, which is defined to be a subluxation of the spine, and as pertaining to plaintiff, the film, so Dr. Shimberg testifies, shows a definite forward displacement of the fifth lumbar vertebra upon the sacrum. This diagnosis apparently upsets the previous theory advanced by Drs. Weinstein and Stewart, that the trouble was in the sacroiliac joint or region.

"Dr. Ruggseger, also an X-ray and pathology specialist, gives the same diagnosis as does Dr. Shimberg. These two doctors, and Drs. Weinstein and Stewart, all were plaintiff's witnesses, yet they differ in their diagnoses.

"Doctors Rand, Barker, Texada, and Barber, all witnesses for defendants, testified positively that the Barker film, last above discussed, shows nothing whatever abnormal; that it shows no subluxation of the spine and no fracture of the spinal process, which must of necessity occur to permit of a subluxation, as is definitely indicated in the cuts accompanying the article written on spondylolisthesis. These doctors all are positive that no fracture is shown in the Barker film and no condition of spondylolisthesis, nor does it show any fracture or abnormality in the sacroiliac region.

"Dr. Rand, to meet the criticism that he had not at first taken a lateral view, made a stereoscopical picture during the progress of the trial. This film, as explained by him, shows almost all around these bones in question, instead of just one side. Testifying from this picture, Drs. Rand and Barker both assert that it shows no condition of spondylolisthesis or other disease or abnormality.

"The better portion of the trial lasting two days was taken up by the testimony of these physicians. The court was impressed with the frank sincerity of all of them and believes each of them thought he was honestly correct in his views. Yet the one side was hopelessly in conflict with the other. In this respect plaintiff's testimony has failed to preponderate.

"Plaintiff's testimony otherwise has also failed, in the court's opinion. His own statements as to his pain and suffering and his inability to perform work of a reasonable character, cannot be taken by itself and alone. The objective symptoms are lacking to corroborate his own assertions. He has the appearance of being robust and in good health, no apparent reduction in weight, stands and sits in apparent ease, and walks and moves about like any normal person.

"Considering the testimony as a whole, the court is impressed that plaintiff has failed to make out a case by the preponderance of testimony which is required under the law; therefore, his demands will be rejected.

"R. C. Culpepper, Judge."

Judgment affirmed.