21 So.2d 878

EDWARDS v. SHREVEPORT CREOSOT-
ING CO., Inc.

No. 37532.

Feb. 19, 1945.

Rehearing Denied March 26, 1945.

Thomas M. Comegys, Jr., of Shreveport, for plaintiff-applicant.

Hollingsworth B. Barret, of Shreveport, for defendant-opponent.

HIGGINS, Justice.

This is an action by a laborer to recover compensation in the sum of $7.80 per week for a period not exceeding 400 weeks (subject to a credit of $46.80, compensation paid for disability for six weeks), alleged to be due him for disability resulting from a crushing injury to his right hand on October 13, 1941, sustained while he was pushing tramcars loaded with long heavy poles, at his employer's place of business.

The defendant, in its answer, admitted that the plaintiff was employed by it, and that he received an accidental injury on the above date, when a portion of the distal phalanx of the third or ring finger of his right hand was crushed and amputated, and that he had been paid six weeks' compensation for this disability. It denied that any other part of the plaintiff's hand was injured and that he suffered any further disability from the accident.

After a trial on the merits, the district judge awarded the claimant $3 per week compensation for a period not exceeding 150 weeks beginning October 13, 1941, less the six weeks during which he was paid compensation, with legal interest on each weekly installment from its respective due date until paid, and taxed the defendant with court costs, including the expert medical fees of the doctors.

The defendant appealed. The plaintiff answered the appeal praying that the judgment be amended so as to grant compensation at the rate of $7.80 per week for a period of 400 weeks and, in the alternative, if the court found there was only partial disability, compensation not exceeding 300 weeks. The Court of Appeal annulled the judgment, dismissed the plaintiff's suit, and denied a rehearing. La.App., 17 So. 2d 648.

The plaintiff applied to this court for a writ of certiorari or review, the granting of which was opposed by the defendant, on the basis that only issues of fact were presented. We granted the writ and the respondent then filed a motion to recall and dismiss it on the ground that no ques-

tion of law was involved and, therefore, it had been improvidently issued.

The Court of Appeal, in its opinion, stated: "The type of injury claimed to have been sustained by plaintiff has resulted in that character of affliction commonly called a 'claw hand.' The fingers have become stiffened in a semi-clutching position, and permit of no extension or flexion. * * * Careful weighing of the testimony of plaintiff's medical witnesses, even in a light most favorable to plaintiff's contention, leaves the result far from conclusive in plaintiff's favor. * * * If the disability could be attributed to an enforced disuse resulting from injuries sustained in the accident, of course, plaintiff would be entitled to recover, but we do not find this to be the case. On the contrary, we can only arrive at the conclusion that the disuse was voluntary on the part of the plaintiff, and the stiffness of the fingers and the atrophy of the hypothenar eminence are attributable to his wilful neglect." Later, the court stated that it was of the opinion that the " * * * plaintiff has failed to sustain the burden of proving his case by a preponderance of the evidence * * *."

Counsel for the plaintiff contends that the Court of Appeal, in reversing the judgment of the district court in his favor, committed an error of law in requiring the plaintiff's medical testimony to conclusively show that the "claw hand" or disability resulting therefrom was caused by the injury he sustained. On the other hand, counsel for the defendant argues that the Court of Appeal required the plaintiff to prove the case by a preponderance of the

evidence only, as shown by the above statement.

The law is clear that the plaintiff in a compensation case bears the burden of proving his case with reasonable certainty, by a preponderance of the evidence. He is not obliged to furnish conclusive proof.

In Dart's Louisiana Digest, Second Series, Volume 7, page 322, Paragraph 149, Workmen's Compensation, Presumptions and burden of proof, it is stated:

"An employee suing for compensation under the Employers' Liability Act (Dart's Stat., 4391–4432), must make out his case by a fair preponderance of the evidence. * * * (1926) Purvis v. Ware Const. Co., 5 La.App. 684; (1927) King v. Rapides Packing Co., Inc., 5 La.App. 424; (1927) Reynolds v. Hotel Youree Co., 6 La.App. 790; (1929) Lee v. Southern Surety Co., 14 La.App. 393, 123 So. 502, 127 So. 36; (1930) Youngblood v. Colfax Motor Co., Inc., 12 La.App. 415, 125 So. 883; (1931) Hillman v. Wetherbee, 16 La.App. 136, 133 So. 535; (1932) Tullis v. United Carbon Co., La.App., 142 So. 307; (1932) Trotti v. Natalbany Lbr. Co., Ltd., La.App., 144 So. 627; (1934) Prudhome v. Cedar Grove Ref. Co., Inc., La.App., 157 So. 158; (1935) Moore v. Thompson-Ritchie Grocer Co., La.App., 161 So. 654."

In 32 Corpus Juris Secundum, Evidence, § 1021, page 1051, under the heading "What Constitutes Preponderance", we find:

"By a preponderance of evidence is meant simply evidence which is of greater

weight, or more convincing, than that which is offered in opposition to it. * * "

In 32 Corpus Juris Secundum, Evidence, § 1016, page 1039, under "Weight and Sufficiency—Degree of Proof", it is stated:

"Conclusive evidence has been defined as evidence which is incontrovertible, either a presumption of law, or else evidence so strong as to overbear all other in the case to the contrary; evidence from which only one reasonable conclusion can be drawn, taking all the facts and surroundings into consideration. It has also been defined as such evidence as, being uncontradicted, controls the decision."

In 15 Corpus Juris Secundum, page 802, we find:

"Conclusive. In its primary legal signification the word has been defined as meaning beyond dispute, or beyond question; decisive, irrefutable, or uncontrovertible; final; leading to a conclusion or decision, not admitting of explanation or contradiction, putting an end to the inquiry, debate or question, also shutting up a matter or shutting out all further evidence. * * * " See, also, American Homestead Co. v. Zemurray, 195 La. 37, 196 So. 13.

\* \* \* \* \* \*

"Conclusive proof. A phrase which has been held equivalent to 'to a moral certainty' or 'beyond a reasonable doubt.' "

. In Words and Phrases, Perm. Ed., Volume 8, pages 365 and 367, the following definitions are given:

" 'Conclusive' means decisive; irrefutable."

" 'Conclusive evidence' is that which is incontrovertible, that is to say, either not open or not able to be questioned, as, where it is said that a thing is conclusively proved, it means that such result follows from the facts shown as the only one possible; the term conclusive proof meaning either a presumption of law or evidence so strong as to overbear everything to the contrary."

From our study of the Court of Appeal's opinion, since it contains two conflicting statements with reference to the extent of proof, we were unable to determine, at the time the writ was granted and we are not certain now, which one of the two degrees of proof the court required of the plaintiff.

Counsel for the plaintiff in his application and in his brief challenges the correctness of the Court of Appeal's statement that voluntary disuse of an accidentally injured member or wilful neglect of an accidental injury causing stiffness to the fingers and atrophy of the muscles is a defense, particularly where it is conceded the attending physician, who was employed by the compensation insurance company, admits he did not advise petitioner to exercise his fingers or recommend any treatment for and manipulation of the injured hand. He states that Section 28 of Act 20 of 1914 deals only with a wilful intention to injure or misconduct and not with disability caused by voluntary nonuse or wilful neglect of the injured member, and that if Section 28 is applicable, such a defense must be specially pleaded and proved by defendant by a preponderance of evidence, :

both of which requirements the defendant failed to meet in this case.

■ There is no doubt that if Section 28 is applied in this case that the burden of proving the wilful intention of the claimant to injure himself is upon the defendant under the express provisions of that section of the statute, as held in the following cases. Johnson v. G. M. Johnson Lbr. Co., La.App., 200 So. 48; Youman v. Railways Express Agency, La.App., 190 So. 858; Sharbino v. Colfax Lumber & Creosoting Co., La.App., 181 So. 20; Morvant v. Ætna Casualty & Surety Co., La.App., 181 So. 595; Harris v. Lily-White Laundry, Inc., La.App., 178 So. 523; Hall v. A. & B. Pipe & Supply Co., La.App., 159 So. 417.

■ Section 28 provides that " * * * no compensation shall be allowed for an injury caused (1) by the injured employee's wilful intention to injure himself or to injure another * * *." In this case it is not contended that the employee's injury was not purely accidental but that the stiffness in his fingers and the atrophy in the muscles or hand, if any, were caused by voluntary inactivity and wilful neglect to use his hand. The defendant's doctor frankly stated he prescribed no treatment or exercise for the plaintiff's hand. It is our opinion that the provisions of Section 28 of Act 20 of 1914 are not apposite here. See Section 38 of Act 38 of 1918.

From the above statements, it is clear that it cannot be successfully urged that the application for the writ and the judgment of the Court of Appeal are confined exclusively to questions of fact.

■ In the case of Madison Lumber Company v. Helm, 202 La. 1061, 13 So. 2d 349, it was held that " * * * 'after a writ of review has been granted, we are obliged to decide the questions of fact as well as the questions of law that are tendered for decision; and to that end it is declared in the Constitution, Article 7, Section 11, that we shall have "the same power and authority in the case" as if it had come here directly by appeal.' Robichaux v. Realty Operators, Inc., 195 La. 70, 196 So. 23, 27."

The petitioner, an unskilled young negro laborer, had been regularly employed by the defendant doing hard work for several months prior to October 13, 1941, the date of the accident. His average weekly wage was $12. He and another negro laborer were pushing two small tramcars loaded with two fifty-foot telephone poles, in order to place them on the steel skids running at right angles to the tramcar tracks so that they could be taken into the mill for the creosoting process. One end of the poles rested on one of the tramcars or dollies and the other on the second one. Nothing supported the poles in the center. The iron cross-arms of the tramcars on which the ends of the poles rested extended across the frame of the cars and past the tracks of either side and slightly sloped toward the center of the cars. One of the poles had a bend or bow in it and as the cars were being pushed along this pole moved sufficiently to jam the plaintiff's right hand against the skid and its support,

causing a crushing and smashing injury to his hand and particularly the distal phalanx of the ring or third finger of the right hand, which was left hanging by a shred of skin and was subsequently amputated surgically. The plaintiff was taken to the office for first aid and from there to the doctor, where he received medical attention, and thereafter treatments until November 19, 1941, when the doctor discharged him as completely well and able to return to hard work on November 24, 1941. Compensation at the rate of $7.80 per week was paid to him for a period of six weeks. During the first week of December, 1941, the plaintiff was suffering from an ulcer and went to a free public health clinic, where he was examined by Dr. J. M. Sheppard, who made six blood tests for venereal diseases and found all of them negative. At that time, he also examined the plaintiff's right hand. He states his finding, as follows: "At that time he was wearing a bandage on the distal phalanx of his ring finger, which had been amputated, the hand was swollen, red and hot, and there was marked stiffness in the last three fingers, and also there was atrophy of the hypothenar eminence, and at that time the atrophy was suggestive to me that it was probably atrophy of disuse.

"Q. When was the next time you saw him? A. Saw him the next time on the 31st of February, 1942, and the swelling and heat, and all evidence of active inflammation had disappeared, but there was still some stiffness in the second finger on the right hand, and the third finger on the right hand, which the distal phalanx had been amputated from, and also from the small finger of the right hand. At that time his grip in the last two fingers was not as strong, comparatively, as the other hand, and there was still some atrophy of the hypothenar eminence."

The doctor's testimony was taken on May 5, 1942, by deposition, and he was asked, " * * * Did you examine the plaintiff again this morning?" and answered, "At this time there was still stiffness of the last two fingers of the right hand, and of course, the distal phalanx of the third finger was still missing, and the grip in the right hand was less than in his left hand, most markedly so in the area of the last two fingers.

"Q. Did you find the atrophy of the hypothenar eminence present at that time? A. Yes, the atrophy was still present."

He also testified that if the plaintiff had attempted to do laborious work with his injured hand in December, 1941, that he would have further impaired it. He recommended at that time treatment by placing the hand in hot water solutions several times a day, massaging, and the manipulation of the hand by squeezing a rubber ball. He was of the opinion from the case history that the disability in the hand resulted from the accident and on the date he examined him, May 5, 1942, he was still unable to perform hard manual labor with his right hand and that, "he should be able to get a good deal of function restored" in his hand in a year's time. He also stated that he could find no pathology or evidence of crushed bones other than the amputated

phalanx and that the plaintiff was a young man of steady nerves and otherwise in good health.

Dr. J. T. Smith, who examined the plaintiff for the Draft Board in September 1941, found him to be in normal health and again examined him on May 13, 1942, for the same Board. He found that the distal phalanx of the right ring finger had been amputated and he had a "sort of claw hand there, with the third, fourth, and fifth fingers being mainly involved. He also has some deviation of his hand to the right; ulna deviation, because the ulna bones are on that side." At the time of his examination in May and at the time he gave his testimony on June 5, 1942, he stated there was a "little atrophy of the muscles on this side. * * * This is the eminence known as the thenar eminence. (Indicating mound on palm at base of thumb). And this is the hypothenar eminence. (Indicating ridge of palm along the bases of fingers). That is made up of muscle. There might be a little atrophy there. Of course, that can be from disuse or be from actual pathology. I do not know what it is due to but I believe there is some there." He was of the opinion that such a condition could result from an accidental injury and based upon the case history was of the opinion that the "claw hand" was the result of trauma and that the plaintiff was unable at that time to do hard manual work. He advised the same treatment prescribed by Dr. Sheppard.

The plaintiff is supported in his testimony that he sustained an accidental injury, the end of his third finger on his right hand almost being crushed off and that it bled freely and he received medical attention from the employers' liability insurance company physician for a period of six weeks when he was discharged as completely healed and able to return to hard work. He is corroborated in his statement that he attempted to do manual labor in connection with making cement blocks but was unable to hold a wheel barrow handle when it was loaded or to keep it from turning over, because of the weakness in the grip of his right hand. He is also corroborated in his testimony that he attempted to secure employment in the Minden Shell Plant, a war industry, but was rejected on account of the condition of his hand. He testified that he did light work around the house and sold flowers for a former employer. He also worked a few days washing a brick wall with a hose and a brush. At the time of the trial, he said his hand was still numb and had a weak grip.

The defendant foreman testified that immediately after the accident he ran out of the mill when he heard the plaintiff scream and upon seeing that his hand was cut and bleeding, he asked him how the accident happened and the petitioner then went through an actual demonstration of how the end of his right ring finger was caught between the skid rail and the cross iron bar on the tramcar. He states that no complaint was made at that time of injury to any other part of his hand.

Another employee of the defendant testified in its behalf and states that he arrived at the scene of the accident "imme-

diately after it happened" but that he did not see plaintiff make a demonstration of how his hand was injured and did not hear him make any statement that only the end of his finger was hurt. He did not see any blood on the skid rail or its support at the place where the foreman said the plaintiff pointed out that his finger had been jammed. He also testified that the foreman at once took the injured young man to the office for first aid.

Dr. S. W. Boyce, the attending physician, who was employed by the compensation insurance company, testified that he examined the plaintiff on October 13, 1941 after he was injured, and amputated four-fifths of the distal phalanx of the third or ring finger on his right hand but found no other injury to any other part of the hand; that after treating him until November 19th, he found that the plaintiff's finger was completely healed; and that he was at that time able to go back to work at hard manual labor but recommended that he be paid compensation to November 24, 1941. He admits that he did not instruct the plaintiff to treat his hand with hot applications or with hot salt water solutions or to massage or manipulate it during the six weeks' time that he had him under observation and treatment or thereafter. On the date of the trial, June 5, 1942, he noticed calluses in the plaintiff's right hand and stated that this was evidence of the fact that the plaintiff had used his hand and, therefore, he concluded that he was a malingerer.

Dr. Chas. S. Boone, an expert for the defendant, testified on June 5, 1942, that he examined the plaintiff's hand and observed the amputation of the distal phalanx of the right ring finger but saw no further evidence of any other injury to the hand. He found that he had been using his hand " * * * because he has some nice calluses here." He noticed slight atrophy in the muscles of the right hand, which he attributed to disuse. He concluded that the plaintiff could flex or close his fingers but that he could not fully extend them because he had done laborious work. He was of the opinion that the plaintiff was intentionally holding his hand in the stiff or claw-like position and was able to do hard work. On cross-examination, he admitted that the first time he examined the boy, several months after the accident, he advised him to use hot salt water treatments three or four times a day and to manipulate the fingers and muscles of the hand.

Dr. T. M. Oxford, a bone specialist, testified that he made several X-rays of the plaintiff's hand before testifying and that there appeared to be no bone injury, except to the amputated part of the finger and he could find no evidence of a crushing injury to the other part of the hand. He admitted there was a condition known as traumatic hysteria and said: "There is hysterical contraction, if it is not just fake in holding it. I don't know which it is. I don't think anybody could tell but the boy." He failed to observe any calluses in the hand and attributed the atrophy of the muscles to their disuse.

It was stipulated that the plaintiff was inducted in the Military Service under the

Selective Service Law, 50 U.S.C.A.Appendix § 301 et seq., in June 1944, and, since that time, has been and is now in the Service.

There is no doubt that the plaintiff suffered an accidental injury to his hand and it would be unusual that the tip-end of the third finger alone would be practically crushed off and not any other part of the hand injured when it was smashed by a heavy object such as a 50 foot telephone pole or tramcar or both of them. At the time the plaintiff went to Dr. Sheppard at the free public clinic, he went there for treatment of an ulcer and there is nothing to show or indicate that at that time, in the first week of December, 1941, he even thought about bringing a suit for compensation. This suit was not filed until February 25, 1942. At both times he examined him, Dr. Sheppard found the plaintiff's right hand in such a damaged condition, there being objective symptoms thereof, that it is manifest he suffered an injury to other parts (that is, muscles, veins, nerves and tendons) of the hand besides the ring finger. Clearly, the plaintiff's hand was in no condition for him to go back to hard work in either December 1941 or February 1942. It is most unlikely that the plaintiff was "compensation conscious" in December, 1941, because there is nothing in the record to indicate that he contemplated suing the company after he had been refused further compensation when the six weeks elapsed. It is also significant that this young negro tried to obtain employment but was rejected on account of his injured right hand and that he endeavored to work at other jobs as best he could.

The defendant's witnesses, the two exports and the attending physician, conceded that the atrophy, that is, the wasting, was not a subjective but an objective symptom and could not be feigned. They apparently felt that they must explain why the plaintiff had what the Draft Board doctor and the free public clinic doctor, disinterested witnesses, described as a kind of "claw hand". The two experts found, on June 5, 1942, that there was some atrophy and accounted for it on the ground that the plaintiff had failed to exercise his hand by using it. The doctor who treated the claimant did not notice any atrophy. However, the attending physician and one of these experts, in justification of the conclusion that the plaintiff was a pretender pointed to the fact that he had calluses in his right hand that could not have been caused by the work he performed prior to the accident. In short, they say this was evidence of the fact that he had been using his hand. Now, since he had been using his hand, for he also admits that he did, the experts failed to account for the atrophy which they themselves observed. The atrophy in the muscles and the stiffness in the fingers are satisfactorily and convincingly explained by traumatic injury of the hand, for defendant's doctors grant that a crushing injury will cause a "claw hand". The district judge and the Court of Appeal concluded that the injured hand was still disabled at the time of the trial.

■ It is our opinion that the plaintiff successfully bore the burden of proving by a preponderance of the evidence that not only the third finger of his right hand was injured in the accident but that other parts of his right hand were so injured as to produce the disability to perform manual labor. Jones v. Hunsicker et al., 188 La. 468, 177 So. 576. There is testimony in the record, particularly in Dr. Sheppard's, that this condition would continue for a period of one year. There is not any evidence in the record that would justify us in concluding that it would continue for a greater period of time, and, therefore, it is our view that the plaintiff is entitled to recover compensation at the rate of $7.80 per week for fifty-two weeks, subject to a credit of six weeks for which period of time he has been paid compensation.

For the reasons assigned, the judgment of the Court of Appeal is annulled and set aside.

It is further ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, R. T. Edwards, and against the defendant, Shreveport Creosoting Company, Inc., in the sum of $7.80 per week for a period of fifty-two (52) weeks, beginning October 13, 1941, with legal interest upon each weekly installment from

its due date, until paid, subject to a credit of $46.80, covering the period of six weeks of compensation previously paid him; and for all costs of court.

HAMITER, J., dissenting in part.

HAMITER, Justice (concurring in part and dissenting in part).

I agree that plaintiff was totally disabled as of June 5, 1942, the date of the trial, and that he is entitled to recover compensation from the time of the accident until the disability's termination which took place some time between said June 5, 1942, and June, 1944, when he was inducted into military service. I can not agree, however, to the fixing at fifty-two weeks of the duration of his disability, because there is not sufficient evidence in the record to justify such fixing. The fifty-two weeks' period is predicated on nothing more than an opinion expressed by Dr. Sheppard that the disability would endure for about one year. Actually the period might have been less or it might have been more. My view is that the case should be remanded to the district court in order that the disability's actual termination date can be definitely established by means of additional and proper proof.