118 So.2d 881

**Leland H. COLTHARP, Sr., et al.,**

v.

**HEARIN TANK LINES, INC., and
Winfred Kirkland.**

No. 43187.

March 21, 1960.

Porter & Stewart, John B. Scofield, Lake Charles, for appellants.

Hall & Coltharp, DeRidder, for plaintiffs-appellees.

VIOSCA, Justice.

This case involves only questions of fact. The district judge, in a comprehensive and well-reasoned opinion, has covered the issues fully. We have reviewed the record and find that there is little that we can add to his opinion. We accordingly adopt it as our own and quote it in full:

"This is a suit for property damages arising out of a collision between a cattle transport truck owned by plaintiff, Coltharp, driven by his employee Eugene Hickman, with Douglas Hickman, also an employee, riding beside the driver, and a gasoline transport truck owned by defendant, Hearin Tank Lines, Inc., and driven by its employee Winfred Kirkland, who is also a defendant herein.

"The collision occurred in Beauregard Parish, between 12:00 and 1:00 o'clock A.M., September 22, 1954, on U. S. Highway 171, which is a paved road, the paved slab being 18 feet wide, running approximately north and south, at a point about thirteen miles south of the City of De-Ridder. The Coltharp truck was traveling north, which would make its proper lane of traffic the east lane, while the Hearin truck was traveling south, its proper lane of traffic being the west one.

"Each of the parties contends, both by pleading, evidence adduced and argument, that the accident was caused solely by the negligence of the other in driving on the wrong side of the road, and, for the same reason, defendant additionally pleads alternatively, the contributory negligence of plaintiff's employee, and reconvenes for the amount of the damages to its truck.

"It was stipulated that the Coltharp truck was damaged to the extent of $2603.55, while defendant's truck was damaged to the extent of $1954.50, and that of the damages suffered by Coltharp, plaintiff, Southern Farm Bureau and Casualty Company, is subrogated to the extent of $2353.55.

"In view of the stipulation of ownership of the trucks, the damages suffered by each, the subrogation, and that the drivers of the respective trucks were acting within the scope of their employment by their respective employers, but one question remains for decision, and that is one of fact, namely, which one (or both) of the trucks was traveling on the wrong side of the road at the time of the accident.

"The case was tried on April 11 and 12, 1956, resulting in some 266 pages of testimony, but at the request of counsel, was left open for the submission of briefs, the last of which was filed July 20, 1956, and the case submitted as of that date.

"Plaintiffs called to the stand four witnesses to prove their contention that at the

moment of the collision and for sometime prior thereto, the Coltharp truck was being driven in the east lane, its proper lane of traffic, and the Hearin Truck was being driven astride the center line of the road with its truck's left wheels some two or two and one-half feet east of that center line, while defendant called twelve witnesses to prove its contention that its truck was being driven in the west and its proper lane of traffic, and the Coltharp truck was being driven astride the road's center line, with the truck's left wheels some two to two and one-half feet west of the road's center line.

"The testimony offered in support of the respective contentions is hopelessly irreconcilable.

"Of the sixteen witnesses called to the stand, only three saw the accident, namely, Eugene Hickman, who was driving the Coltharp truck, his fellow employee and cousin, Douglas Hickman, who was riding in the cab of that truck, and defendant's employee, Winfred Kirkland who was driving defendant's truck and is also a defendant.

"Both Hickmans testified positively that at the moment of the impact between the trucks the Coltharp truck was as far to its right hand or east side of the paved slab of the road as it could get, while the left wheel of the Hearin truck was some two to two and one-half feet on the wrong or east side of the road's center line. Defendant Kirkland, on the other hand, testified with equal positiveness, that it was the Coltharp truck that was traveling with its left wheels over the center line, and west of that line some two or two and one-half feet, while the truck he was driving was traveling well on its own or the west side of the road with some of its wheels on the road's west shoulder.

"All of the witnesses agree that in the collision the left front wheel of the cattle truck was knocked off, but there is definite disagreement as to the point on the road upon which the end of the axle or spindle, that is the part upon which the wheel runs, first struck the road and the course of the mark it left on the road from that point to the point at which it came to rest, on the right hand or east side of the road, some 125 feet north of the point of impact. The substance of the testimony of both Hickmans is that the end of the spindle, as we will call it, struck the pavement about two and one-half feet east of the road's center line, and from the marks it left in the pavement, as well as the trail of some liquid, water or brake fluid, also starting in the east lane, the path of the Coltharp truck was traced as starting in the east lane, swerving or turning into the west lane, and back into the east lane. The picture P-1, filed in evidence by plaintiff was identified by State Police Trooper Chance as being a true representation of the situation on the ground at the scene of the accident, the view being

from the south to the north. It probably should be said now that the Court in arriving at the conclusion it has reached as to how the accident happened and whose fault it was, has given great weight to Trooper Chance's testimony. Mr. Chance has been a State trooper for more than five years and of course during that experience has investigated many traffic accidents. As a matter of fact, he has been a witness in this Court on a number of occasions. His testimony is always straightforward, clear and concise, and has always impressed the Court as being wholly trustworthy. Trooper Chance arrived at the scene of the accident at about 1:30 A.M. Upon arrival, and after ascertaining no one was injured, he proceeded to make an investigation so as to establish the point of impact. He found in the east lane of traffic what he took to be water from the Coltharp truck's radiator, about four feet east of the road's center line, and about two feet east of that line, he found glass and other debris. The water or liquid, beginning about four feet east of the center line, was traceable on the road from that point on several feet to where it crossed over the center line, and then back onto the east lane and to where the Coltharp truck had come to rest in the east lane 125 feet from the point of impact. Trooper Chance marked with a dotted line on the picture P-1, the line of travel the Coltharp truck took after the impact, his opinion being based on where he found the debris (marked X), the first water (marked W) and the tracing of the water markings, along the path shown by the dotted line, to where he found the Coltharp truck. In the west lane of traffic, on the west side of the road at the point marked "Wheel" on the picture, he found the imprint of a wheel, which he took to be the one from the Coltharp truck, which imprint was located 28 feet north (or northeast) of the point of impact, as he fixed that point. The imprint of the wheel or its "lugs", as Chance believed, was made by the wheel being run over. He found no debris, glass or other evidence of the impact having occurred in the west, or the Hearin truck's lane of traffic.

"It should be noted here that one of the controlling reasons causing the Court to reach the conclusions it has reached is that the water or other liquid found by Chance, within an hour after the accident, could be and was traced by him from the point of impact, in the east lane, to the point where the Coltharp truck came to rest and this same showing of water or other liquid could very well have, and probably had, entirely disappeared before any of defendant's witnesses, other than Kirkland himself, viewed the scene several hours after the accident.

"Archie Pharis, another witness for, and an employee of plaintiff's, went to the scene of the accident to pull the Coltharp truck off the road and bring the driver back. When he arrived, the two Hickmans, Kirkland and Trooper Chance were the only

ones present. He assisted Chance in making the measurements on the road. He saw the "wet spot" and some dirt "there where the trucks contacted one another" and a "mark on the road", which he said were between two and three feet east of the road's center line. This witness testified that the marks could be traced from the point they started on the east side, over across the center line and back to the east side, thus corroborating Chance as to the line of travel of the Coltharp truck, after the impact, until it came to rest. He said that, according to their measurements and what they could see, they thought the outside dual wheels of the Coltharp truck, or possibly both outside dual wheels, were on the shoulder of the road. He saw no skid marks, scratch marks or truck marks on the west side of the road at the point of impact but there were glass and debris on the east side.

"It is obvious that unless the two Hickmans, Trooper Chance and the witness Pharis lied, the collision occurred in the east lane of traffic. Neither of the four named witnesses have any direct personal interest in the outcome of the case. As employees, the Hickmans and Pharis, may be said naturally to be more favorable to their employer than to the defendant, a stranger, but certainly Trooper Chance cannot be said to have any interest whatever, or be biased to any degree for or against either party. He is an experienced official, charged with the duty of making investigations of such accidents and making impartial reports of his findings. His testimony as to the circumstances he found after the accident, and being so soon on the ground, corroborating so definitely the testimony of the Hickmans and Pharis, leads the Court to the emphatic belief that plaintiffs' contention that the collision occurred in the east lane of traffic is the correct one. It is not reasonable to believe that defendants' witnesses, other than Kirkland, viewing the scene many hours after the accident, after the heavy traffic of a heavily traveled through highway has passed over the point of impact, could be in as favorable a position to correctly ascertain the point of impact of the two vehicles as were Trooper Chance and Mr. Pharis, who arrived shortly after the accident when the signs left by the collision were more likely to be still present on the road.

"As we have already noted defendant Kirkland testified with positiveness equal to that of the Hickmans, that the collision occurred on the west side, that is in the Hearin truck's lane of traffic, when the left wheels of that truck were two or more feet west of the road's center line and its right wheels, or some of them, off the pavement on the right shoulder of the road. According to Kirkland he saw the fluid in the west lane that Chance and the two Hickmans testified they saw in the east lane. He denied that Chance, the trooper, made any meas-

urcments on the road during his investigation of the accident, although Chance, the Hickmans and Pharis all testified that the measurements were made with Pharis helping the trooper and one of the Hickmans holding the flashlight. Chance testified as to various measurements he made on the scene during his investigation, and on his report of the accident made at the time, a duplicate original copy of which was filed in evidence and marked P-2, appear various measurements in feet. No attempt was made to dispute the accuracy of these measurements, nor was it denied by any, other than Kirkland, that Chance made them that night while investigating the accident and within a short time after the occurrence. The Court doesn't believe that Kirkland merely forgot about Chance and Pharis making the measurements in his, Kirkland's, presence and his denial of that testimony has caused the Court to look with skepticism upon his other testimony. However much the Court dislikes to say that it believes any witness falsified, it feels that it cannot do otherwise than to disbelieve Kirkland.

"With the exception of the two Roberts whose testimony will be hereafter discussed, no witnesses for defendant, other than Kirkland, viewed the scene until six or more hours after it occurred. As has been noted, the road is a through highway and the Court believes, being familiar with the road, it is justified in taking judicial notice of the fact that it is heavily traveled. This

is a circumstance worthy of note here because we must know that water, if it was water (and Chance thought it was water from the Coltharp truck radiator) that Chance and the Hickmans saw in the east lane of traffic would have disappeared by evaporation, or being repeatedly run over by cars, in the six hours or more, before the next witness on the scene saw it. The same process of reasoning leads to the conclusion that after six hours in such traffic, the glass, mud, etc., that Chance and the Hickmans say were in the east lane of traffic at the point of impact, probably would be dissipated all over the road and the shoulders on both sides, hence the greater weight should be given to the testimony of those who viewed the scene immediately after the accident, as opposed to the testimony of those who viewed it six hours to 25 hours thereafter.

"Messrs. Schroeder and Tylock, mechanic and terminal manager respectively of Hearin, and Albert Sweet, one of its colored employees, arrived on the scene of the accident, Schroeder said about 8:00 A.M., Tylock said about 7:00 A.M. and Sweet said about 7:30 A.M. after the accident, which we have seen occurred between midnight and one o'clock A.M., or from six to seven hours after it occurred. Tylock tarried at the scene but a few minutes and at that time made but few observations but went on to DeRidder to see about getting the Hearin truck moved, Schroeder and Sweet remain-

ing at the scene until Tylock's return sometime that afternoon. Schroeder and Sweet did make extensive investigation of physical facts and circumstances from which they deduced that the collision occurred in the west lane of traffic. They observed in the west lane skid marks of the Hearin truck, the mark the Coltharp truck's axle or spindle made when it hit the concrete pavement, and found a wheel bearing and washer, which they believed to have come off the Coltharp truck, on the shoulder of the road on·the road's west side. Schroeder testified that 'there is about a foot of asphalt laid on the inside of the curve, in other words, on the western side of the curve, and were—and there were tire marks there from the Hearin truck' and on the next page of the testimony he testified that the marks were on the 'asphalt shoulder'. As a matter of fact and as abundantly established by the record, there was at the time of the accident *no asphalt shoulder* on the road at that point, the asphalt shoulder that is there now having been placed there in the summer of 1955, after the army maneuvers conducted along that road. When this Court is convinced that a witness has testified falsely on any material point for the purpose of deceiving the Court, it then doesn't know whether it can accept as true any other statement the witness may make as to any other point. It must necessarily view the whole testimony of Mr. Schroeder with great skepticism, if not complete disbelief.

"The same observation may be made of the testimony of the colored witness Sweet, who said he saw where both wheels of the Hearin truck went off the road onto the *'slab of black top* about eight inches wide'. There was at the time no slab of 'black top' or 'asphalt' at the side of the pavement. Neither Sweet nor Schroeder could have seen any wheel or tire print on such a slab because none was there. If they testified falsely as to that, this Court can't know what part, if any, of the remainder of their testimony to believe.

"The witness Tylock, who arrived first on the scene some six or seven hours after the accident, testified that he saw a hole in the west lane of traffic where the axle of the Coltharp truck had gouged out a place in the concrete when it fell, after the wheel had come off, and some 15 or 20 feet on down the same (west) side of the road, he saw an imprint of a wheel as if it was run over by the Hearin trailer. He also saw the place which Kirkland pointed out to him where his tires. had left the road on the west side. While the Court has no reason to doubt that Tylock testified truthfully, so far as he knew the truth, the fact remains that what he said he saw depended to a large extent on what Kirkland pointed out and what Kirkland told him were facts. It must be remembered that Tylock was terminal manager and, naturally, Kirkland wanted Tylock to believe. that the accident.was the·

other fellow's fault. We have seen that Kirkland was not too considerate of the truth even when under oath. It would be asking too much to ask the Court to believe under the circumstances, that Kirkland would hesitate to color the facts for the purpose of having the boss believe he, Kirkland, was not at fault.

"Mr. John J. McCain, who was the Safety Director for Hearin, came to the scene of the accident sometime in the afternoon of Wednesday after the accident occurred between twelve and one o'clock Tuesday morning or 24 hours or more after the accident. He was alone but found no difficulty in locating the exact point of the accident from what Kirkland, Tylock and Schroeder had told him over the telephone. He found the place of the accident approximately 12½ miles from DeRidder, evidently the distance Schroeder, Kirkland, or Tylock, or all three had given him. The accident occurred opposite the residence of Mr. John Roberts, who testified in behalf of the defendant that he lives 13.3 miles from DeRidder. Whether this discrepancy of eight-tenths of a mile between the distance McCain thought the accident happened and where it actually happened, indicates that he might not have been at the right place, the Court does not know. With the view of recalling Roberts and asking him from where, that is what part of DeRidder his 13.3 miles were measured, the Court asked McCain that question and he replied 'As I *recall*, sir, as I left, I *believe*, the railroad tracks here in DeRidder'. (Italics added.) Since he apparently didn't know definitely from where he started his measurement, it was not thought worthwhile to have Roberts testify as to where he started his. It did and does now seem somewhat strange that this witness would come all the way from Baton Rouge to view the scene of the accident, pass through DeRidder, where presumably he might have found one of the Rathburns or one of the Salters, to whom Kirkland had pointed out where the accident occurred, and have asked them to accompany him to the scene, or at Lake Charles, some 37 miles away he might have obtained Tylock, Schroeder or Sweet, his Company's employees, who had the same information, or Kirkland, himself, at Shreveport, but instead, he went to the location alone, evidently for the purpose of satisfying himself as to how the accident happened, and necessarily "presumed" he was at the right place. Would it not seem more reasonable to believe that when this safety engineer went to establish the cause of an accident, on a highway, more than 24 hours after its happening, he would have had Kirkland meet him there and obtain his version on the ground? Frankly, the Court was not impressed with Mr. McCain's testimony. He found pieces of red glass off the shoulder of the road on the west side. No other of the 16 witnesses saw that. He didn't·

pick it up and bring it to Court. He observed the signs on the road where the wheel had been run over and where the axle had made the hole, all in the west side. The Court attributes but little, if any, weight to Mr. McCain's testimony. It didn't ring true when he was giving it.

"E. E. Rathburn, whom Hearin employed to remove its truck to New Orleans, together with Ben Salter working for Rathburn and who actually took the truck to New Orleans, reached the scene some time in the early afternoon or 12 or more hours after the accident. Mr. Rathburn was extremely solicitous of the welfare of Kirkland, whom Chance had charged with reckless driving and made extensive detailed investigation of the evidence on the ground. Both he and Salter, and later Salter's brother, all found skid marks, glass and other evidence such as where the Coltharp truck's axle had dropped, tending to prove that the impact occurred in the west lane of traffic, but found nothing in the east lane. Of course, the water beginning in the east lane and going on to where the Coltharp truck had come to rest (it was not there when they arrived) had disappeared, evaporated or been obliterated by traffic. The Court was impressed during Rathburn's testimony, that he was principally concerned more with an effort to discredit Chance than he was with giving an accurate account of what he might have actually seen. As to the other

Rathburn and the Salters, they obviously saw only what E. A. Rathburn pointed out and told them.

"The testimony of the witness Snapp actually proved nothing. He said he was passing by the scene when E. A. Rathburn asked him to stop and pointed out some skid marks on the west side of the center line, but he wouldn't estimate whether they were ten, fifty, or five feet long. The skid marks he saw at about 11:30 A.M., and where some wheel marks had been off the pavement on the west side could, of course, have been made by any car during the six hours which had elapsed since the accident.

"Mr. John Roberts and his son Johnny, who live nearby, were awakened by the noise incident to the accident and immediately went to the scene, that is, they walked down to their fence near where the Hearin truck had come to rest and inquired whether anybody was hurt, and upon being informed that no one was injured they returned to their home. They did not go on the outside of their field fence, notwithstanding which, Mr. Roberts said he saw skid marks and 'something that looked like it had scraped, going North 18 or twenty feet, and something that looked like water,' all on the west side. The Court is inclined to the belief that perhaps Mr. Roberts has confused what he saw that night with what he saw the next morning, except that there probably was no water

on the pavement next morning when he and his boy returned to the scene some five or six hours after the accident. It will be remembered that when Mr. Roberts first visited the scene, it was between twelve and one o'clock A.M., and naturally at that hour it was dark, unless the moon was shining, which is not shown. However, Mr. Roberts said he was able to discern all the things he said he saw in the lights of passing cars. The lights of both of the trucks involved were shining away from the direction of the point of impact. By reference to the picture P–1, it will be seen that the fence inside of which Mr. Roberts remained on his first visit to the scene between twelve and one o'clock at night, is a considerable distance from the east side of the pavement. Estimating from the picture and remembering that the east half of the pavement is 9 feet wide, it appears that the fence is some thirty-five or 40 feet from the east edge of the pavement and would be some 50 feet or more from that part of the west half of the road on which Mr. Roberts said he observed the water, glass and scratch mark. The Court very seriously doubts that under the circumstances prevailing in the middle of that night, Mr. Roberts could have seen the details of the situation he now believes he did see.

"From its review of all of the testimony, seeing and hearing the witnesses testify, considering who was in the better position especially from the standpoint of the lapse of time after the happening of the accident, the Court has had no difficulty arriving at the conclusion that plaintiffs' version of the cause of the accident, that is, that defendants' truck was traveling on the wrong side of the road, is the correct one.

■ "True it is that defendants' witnesses numbered 13 as opposed to 4 for plaintiffs, but it is not always that the preponderance of the evidence is on the side of the greater number of witnesses.

■ "As Judge McBride, speaking for the Orleans Court of Appeals, in the recent case of Fourchea v. Maloney Trucking & Storage, Inc., 88 So.2d 82, and citing Edwards v. Shreveport Creosoting Co., Inc., 207 La. 699, 21 So.2d 878, said:

"'To prove a case by a preponderance of the evidence simply means evidence must be produced which is of greater weight or is more convincing than that which is offered in opposition to it.'

"And Wigmore on Evidence, Vol. 4, 2d Ed., P. 308, says:

"'Credibility does not depend on numbers of witnesses * * *'.

"'In general, the testimony of a single witness, no matter what the issue or who the person, may legally suffice as evidence * * *'"

"For the reasons assigned judgments will be rendered in favor of plaintiffs as prayed for, and rejecting defendants' demands in reconvention, all at defendants' cost."

In this Court, appellants attack the credibility of State Trooper Leo Chance on the ground that he is a good friend of plaintiff's driver. While Chance admitted on cross-examination that he knew plaintiff's driver for about four years, there is no evidence in the record that there was any personal or social friendship, or business relationship between them.[1]

In Vinzant v. L. L. Brewton Pulpwood Co., Inc., La., 118 So.2d 117, 121, where there was a conflict in the testimony and a question of veracity involved, we said: "In any event the district judge saw and heard these witnesses and was in a better position to judge their sincerity and veracity than the appellate court. When there is direct conflict between the testimony of the plaintiff's witnesses and the testimony of defendant's witnesses, great weight should be given to the finding of the district judge who saw and heard the witnesses. Ken-drick v. Kendrick, 236 La. 34, 106 So.2d 707, and the cases cited therein."

Counsel for appellants argues in this Court that the position of the physical damages on the two trucks proves that it was the Coltharp truck which struck the Hearin truck first. The Coltharp truck was damaged on the front left side while the Hearin truck suffered damages to the rear of the running board and the dual wheels which are behind the truck's cab. We do not see how any importance can be attached to the position of the physical damages on the two trucks. This damage might well have been brought about when the Hearin truck, while traveling in the east lane, attempted to pull back into the west lane. The issue is whose negligence caused the collision, not which truck struck the other first or what part of each truck was damaged.

We believe all other questions raised by the appellants in this Court have been clearly answered by the trial judge.

For the reasons assigned, the judgment is affirmed. Appellants to pay all costs.

---

1. The only testimony in the record on this question is the following:
"Q. How long have you known the Hickman boy, Mr. Chance? A. I've known him about four years—had personal contact with him about four years.

"Q. What were the occasions of the contact? A. Well, he delivered cattle for Mr. Coltharp, and naturally the boy was raised here in the Parish, just seeing him, and knowing him.
"Q. You knew him pretty well? A. Well, I know his father better than I do him."