ELLIS, Judge.
This is a compensation claim in which plaintiff seeks an award as for total permanent disability. Plaintiff was awarded: judgment for temporary disability from, February 4, 1959, the date of the accident, to August 1, 1959, arid defendant has prosecuted this appeal. Plaintiff has answered: the appeal asking that the judgment be amended so as to allow recovery for total-permanent disability.
There is no dispute as to the occurrence of the accident and the existence of a period of disability as a result of the injury..
From the record it appears that on February 4, 1959, plaintiff accidentally stepped *697 into a pot containing hot lead causing ■third-degree burns on his left leg. A skin .graft of an area of one to two inches in width and extending around at the left ■ankle except at the Achilles tendon was made. The grafting operation was performed on March 10, 1959, with skin taken from the thigh and plaintiff was paid compensation at an agreed rate of $29.48 through April 8, 1959.
Both counsel for plaintiff and counsel for ■defendant agreed that the sole question at issue is whether plaintiff had any disability beyond April 8, 1959, and if so the extent ■and duration.
Dr. A. K. Mclnnis, the surgeon who did the skin graft and attended plaintiff in the post-operative period, testified that on March 27, 1959 the skin graft area was healed. This doctor saw plaintiff again on July 31, 1959 when he found that he walked without difficulty. Dr. Mclnnis further testified that plaintiff complained of numbness over the skin graft area, throbbing at night, catchy feeling in left shoulder and shortening of the heel cord. On examination he found that plaintiff had complete range of motion, of the left ankle, no atrophy of leg or shoulder muscles, normal reflexes and the only abnormality being anesthesia over the skin graft area. Doctor Mclnnis was of the opinion that while there was lack of sensation in the area where the graft had been performed, there was no limitation of left ankle and that such numbness causes no disability. Further, he was of the opinion that plaintiff was exaggerating his complaints and that there was no reason why he could not as of July 31, 1959, perform hard work. The doctor described plaintiff as suffering only from “compensationitis.”
Dr. James W. Lorio, the attending physician who was called to this plaintiff on the day of the accident and continued with the case until Dr. Mclnnis did the skin graft on March 10, 1959, testified that on his examination of April 6, 1959 he found the plaintiff sufficiently recovered to resume full manual employment beginning April 7, 1959. The doctor next saw plaintiff on August 5, 1959. On that day the plaintiff’s complaints were numerous. The doctor gave him a general physical and neurological examination. Laboratory tests of blood and urine showed them to be well within normal limits. Dr. Lorio found only partial anesthesia limited to the skin graft area. Dr. Lorio was of the opinion that plaintiff’s complaints were not compatible with known organic diseases. In his testimony, Dr. Lorio discussed and explained phases of lead poisoning, ulcers, etc., and said that this plaintiff was not afflicted with the various troubles complained of and that when he was discharged on April 6th, he could have returned to his employment at Schuylkill Company and that he was of the opinion that there was no disability. The doctor said further that having made a pre-employment examination of this plaintiff and having treated him through this accident, he had come to know the plaintiff well, and that no organic or mental disease was found. Dr. Lorio further testified that he. did not do a mental status or psychiatric examination but that it is part of his routine to observe the patient closely and having done that, there was noted no anxiety condition and no evidence of mental illness at any time.
Dr. Howard Hansen, a general practitioner, examined plaintiff several times at the request of counsel for plaintiff. He testified that on March 31, 1959, plaintiff complained of cramping in his abdomen. The doctor thought he might have peptic ulcers or lead poisoning. At that time there was some swelling of the left ankle. Dr. Hansen further testified that on April 7, 1959, there was improvement of the abdominal complaints, and of the skin graft, but that he detected slight oozing at the skin graft location. On May 20, 1960, Dr. Hansen found that the skin graft area had improved, but felt that plaintiff suffered from permanent injury to the blood vessels in the nerves of the ankle joint.
Dr. Hansen’s last examination was made on May 27, 1960. At this time Dr. Hansen *698 testified that since he could find no organic basis for plaintiff’s complaints, he was suffering from a psycho-neurotic reaction.
At the request of plaintiff’s counsel, plaintiff was examined by Dr. Robert M. Gilliland, a psychiatrist, presently teaching in New Orleans, Louisiana, some year and three months after the accident. Dr. Gil-liland testified that plaintiff was a “compensation neurotic” and suffering from hysterical conversion psychoneurosis. However, Dr. Gilliland testified that plaintiff had been guarded during his interview and that his diagnosis depended to a great degree on whether plaintiff was telling him the truth. No psychological tests were made by Dr. Gilliland and his analysis of plaintiff was. limited to one interview of approximately one hour and fifteen minutes.
Plaintiff testified that he could not do much walking and when he stands “it seems like a bunch of ants,” that the leaders “draw up a little bit;” and that his leg swells up and feels numb from the foot up to the knee. On cross-examination, plaintiff admitted having held himself as able to work to draw unemployment compensation; and in fact drawing unemployment compensation for four months, commencing in November of 1959. The trial judge, in his written reasons for judgment stated that he examined plaintiff in court and noticed some slight difference in appearance, looking at both ankles from the front. However, the trial judge stated that the ankles looked the same from the rear and the side views.
In summarizing the evidence as presented on the trial of the case, the District Court observed: “Dr. Lorio’s testimony disclosed that his examinations and study of this case were noticeably thorough and painstaking. Counsel for plaintiff sent the plaintiff to a professor of psychiatry of a university in New Orleans for evaluation. The professor as a witness diagnosed plaintiff’s condition as ‘conversion reaction,’ and said he thought in his conversation the plaintiff was concealing something that might hurt his claim for money, but the professor never did say that he thought the plaintiff was physically or mentally unable to work. It is my firm belief that while Dr. Lorio does not pose as a specialist in the exclusive field of psychiatry, as a result of his intimate contacts with this plaintiff over a period of more than six months, Dr. Lorio is in much better position to form an opinion on both the physical and mental stability of plaintiff than a psychiatrist could possibly be after an hour in office conversation with him about his sex, appetite, and I presume other kindred aspects.
“Dr. Lorio’s testimony is entirely convincing to me. I might add that the opinion of Dr. Mclnnis is equally positive that there was no ailment to keep this plaintiff from working on April 7 and on July 31, 1959. Dr. Hansen found him able to work on May 20, 1959, and on later examinations after plaintiff made various new complaints about his back ache, etc., for which Dr. Hansen could find no basis, the doctor did suggest possibility of phlebitis, lead poisoning, ulcers, neurosis, etc., all of which the testimony as a whole, in my humble opinion, rules out. For the reason that Dr. Hansen reported there was still some infectious discharge at the skin graft on April 7, 1959, a little tenderness on May 20, 1959, and slight swelling, with improvement on June 25, 1959, I am willing to stretch a point in favor of plaintiff and give him until August 1, 1959 for complete and permanent recovery.”
From an examination of the record as a whole, we are certain that the trial judge believed that plaintiff had fully recovered as of April 7, 1951. The preponderance of the evidence[1] convinces us *699 that plaintiff had no disability as of April .7, 1959.
For the above and foregoing reasons, the judgment appealed from is amended so as to allow plaintiff disability until April 7, 1959 and as amended it is affirmed.
Amended and affirmed.

. The preponderance of evidence is evidence which is of greater weight, or more convincing, than that which is offered in opposition to it. Edwards v. Shreveport Creosoting Co., Inc., 1945, 207 La. 699, 21 So.2d 878; Hardin v. *699 Operating Co. et al., 1947, 212 La. 467, 82 So.2d 893. Although such proof must be of a reasonable certainty, it is not required to be of an absolute certainty. Sollberger v. Walcott, La.App.lst Cir. 1958, 101 So.2d 483.
In determining the preponderance of evidence, the witnesses for the respective parties are not counted, but their testimony is weighed. Wright v. Holder, La.App.2nd Oir. 1953, 72 So.2d 529; Powell v. Independent Cab Operators Ass’n, La.App.Orleans 1945, 22 So.2d 471.