ELLIS, Judge.
■Plaintiff has filed this suit in which he alleged that while employed by the Caldwell Sugars Cooperative, Inc., he became entangled in some sugar cane and was ac-cidently thrown from a height of about 14 feet to an iron table against which he struck his back and was severely injured, and that as a result of the accident he is permanently and totally disabled and asked for the maximum amount under the Act, LSA-R.S. 23:1021 et seq., for a period not to exceed 400 weeks.
The defendant admitted the accident but contended that compensation had been paid to the plaintiff from the date of his injury, December 6, 1949, until January 30, 1950, comprising eight weeks, and that plaintiff on the latter date was fully recovered and is not entitled to any additional compensation.
Judgment was rendered in favor of plaintiff awarding him an additional five weeks, from which judgment the plaintiff has appealed.
The evidence shows that the plaintiff on December 6, 1949 fell from a height of 14 feet and struck his back on an iron table. He was first treated by D*\ Thomas who testified- that he saw the man immediately after the accident and treated him until December 17, 1949, and that at that time 'he was totally disabled but that he had not seen him since as he had transferred the plaintiff to the care of Dr. LeBlanc. In a report of December 21, 1949, Dr. Thomas was of the opinion that further treatment was needed for six weeks.
Dr. LeBlanc, a witness for the defendant, testified that although the plaintiff complained of pain in his abdomen, he' could find no injuries there as a result of the accident, and that although he saw the plaintiff from the 21st of December through the 28th of February on an average of three times a week and after that about once a week until March 7, he found nothing upon which to base a diagnosis of permanent, total disability. In fact, he testified that on March 7th he could find no further reason to treat the plaintiff. During that time the plaintiff was complaining of pain in his back and legs and that he felt weak and could not walk without crutches. It is this doctor’s positive testimony that the plaintiff was completely recovered on March 7, 1950. In contrast to his testimony we have a report by Dr. LeBlanc signed on the 28th day of February 1950 in which he outlined the nature of the injuries or accident as “contusions and bruises to back.” To Question 16, “Is disability now total or partial?” he wrote “Total.”
We also have the testimony of Dn Harry D. Morris of New Orleans, who stated that he examined plaintiff on January 25, 1950 and that at that time he felt a mild amount of tenderness about the dorsal region of the spine but that the movements of his back were complete without muscle spasm and he was able to perform the normal movements of the spine. The plaintiff complained to this doctor of pain about the right breast but the findings were negative. X-rays were made in addition to the examination, and it is this doctor’s testimony that he could find no objective symptoms to sustain any of plaintiff’s complaints. Dr. Morris did state that he found evidence of contusion of the muscles as well as a laceration which had healed *845 which was evidence of injury to subcutaneous tissues with no evidence of injury to the nerves but that the contusions were of a temporary character and would respond to treatment. In Dr. Morris’ report he stated:
“Opinion. This patient’s complaints are largely subjective in nature with a little objective evidence of disability. The blow the patient received at the time of his accident on December S was a direct one to the back and no evidence of fracture by x-ray. The soft tissue damage now has had time to heal. I believe that this patient should be given an additional two weeks for convalescence in order to limber up the back and I believe he can return to his original occupation at that date without any permanent disability of any degree.”
The plaintiff testified that his back, stomach and chest were hurt in the fall -and that on the date of the trial, May 8, 1950, he was still totally disabled; that he had been going to the Charity Hospital and had made his last trip there a couple of days prior to the trial. His main complaint was with regard to his back and he "testified that due to the ■ weakness in his back he had to have crutches to support him. He stated: “My back gives way on -me. I get weak in my back.” His testimony was corroborated by his wife and •daughter.
In addition, we have some photostatic •copies of the records of Charity Hospital, most of which we are unable to read, how•ever, they show that on April 6, 1950 he first went to the Charity Hospital, and on ■one of these photostats his condition is diagnosed as “Lumbar Sacral Sprain.” ‘On May 4, 1950 he again reported to the ■Charity Hospital but we are unable to decipher the report. On April 6, 1950 the :x-ray report from the Charity Hospital -states that “Lumbo sacral joint is not well ■visualized in the lateral view. No other ■definite evidence of bone or joint disease in the lumbar vertebrae.”
On the date this case was argued counsel for plaintiff offered some photostatic copies of ChaHty Hospital Records to which counsel for defendant objected. These records show that the plaintiff returned to the hospital on May 25, 1950. It seems that the doctor at the hospital had recommended a jacket or special belt to be worn by the plaintiff around the lower back. This report states that the plaintiff “hasn’t obtained jacket as yet.” As near ■as we can decipher this photostatic copy it' says : “Much improved” but still desired the plaintiff to obtain a jacket for his back and to return in a month. There is also a photostatic copy of a Charity Hospital record of June 22, 1950. On the side it says: “Welfare can’t buy corset for patient. They are writing insurance company to see if they can help.” This report shows that he' still did not have the corset or jacket and was still having complaints, and it seems he was again advised to get the corset and return in two weeks. On July 6, 1950 the report shows “No essential change; return in three weeks.” On July 27, 1950 the report states no change but that the patient still has not gotten lumbo sacral support. It further states: “Please have Social Service see Pt. and try to rush up the approval & purchase of this support. It has been almost 4 mos. now that he has been awaiting this.” This photostatic copy shows he was to return in one month. On August 24, 1950 we have a photostatic copy of Charity Hospital records which states, “No change. Still has not gotten lumbo sacral support”. In this record it is further written: “This pt. has definite findings of injury which warrant his having a lumbo sacral support & steel staves. Dep. Welfare won’t provide for him. Why can’t the company for which he worked at the time of his accident pay for it. Surely it doesn’t require 5 months for this!! Return 1 mo. Brock.”
On September 21, 1950 the photostatic copy of the records of Charity Hospital show that the plaintiff returned to the Hospital and it is written on this record, “No support. Evidently he can’t get it. His S. S. can’t buy it & neither can company.”
While these documents are not admissible as they were not offered on the trial of the *846 case, they do state that this man. was still injured on September 21, 1950 and that the doctor that examined him or was attending him at Charity Hospital thought that there was evidence of lumbo sacral injury.
Taking the testimony of the plaintiff, his wife and daughter, together with the report of Dr. LeBlanc on February 28, 1950 that the plaintiff was totally incapacitated, as well as the photostatic copies of the reports of 'Charity Hospital, that were properly introduced, we believe that the case should be remanded to the lower court. A man who fell 14 feet and struck his back on an iron table must have received a hard blow. We believe that justice would be done by remanding the case for the introduction of further evidence by either party. It is so ordered.