TATE, Judge
(dissenting).
If the majority opinion stands, a permanently disabled workingman will be denied workmen’s compensation benefits, finally and for all time, just because the majority has arbitrarily concluded the workingman should have proved his case beyond a reasonable doubt, not merely by the preponderance of the evidence.
One could not glean from the majority opinion any reason why a conscientious and experienced trial judge not only held the plaintiff to. be permanently and totally disabled, but why he further assessed penalties against the defendant insurer for arbitrary failure to pay compensation for undisputed disability.
One could not glean from the majority opinion the slightest reason why the claimant, an experienced driller, who had worked continuously for eight years for his present employer (Dixie Drilling) — who had not even temporarily left his work or made a compensation claim during those eight years of constant employment, during which he had sustained broken ribs and toes in other accidents in the course of his present employment, Tr. 61-62 — one could not possibly suspect, from the majority’s treatment of the facts, why this skilled workingman left a steady job paying him $850 per month, just to file a worthless compensation suit in an effort to collect $35 per week in workmen’s compensation benefits.
The basic mistake in the majority’s approach is that it is requiring the claimant to prove his disability, not merely to a legal certainty (i. e., by a preponderance of the evidence), but to an absolute certainty (i. e., beyond a reasonable doubt, as in criminal cases).
The claimant produced proof of a permanent work-caused disabling allergy-through the testimony of the only medical witness in a position so to testify, the attending physician who actually examined and treated him during the period when he became sensitized to drilling mud; the only physician, we might add, who actually observed the type of excruciatingly painful lesions and who actually was able to observe their reaction over the course of his treatment of them. This, the majority says, is not enough, because this medical witness *423 was only a general practitioner, and because both he and the dermatologists felt that any possible reservation as to this diagnosis could be eliminated by conducting a series of medical tests; which was not done. But the diagnosis of disability stands essentially uncontradicted, as we shall see, and such constitutes a preponderance of the evidence. The claimant did not have the further burden to corroborate this medical testimony beyond any reasonable doubt.
Our Supreme Court stated in Edwards v. Shreveport Creosoting Co., 207 La. 699, 21 So.2d 878, 879-880: “The law is clear that the plaintiff in a compensation case bears the burden of proving his case with reasonable certainty, by a preponderance of the evidence. He is not obliged to furnish conclusive proof * * * ‘By a preponderance of evidence is meant simply evidence which is of greater weight, or more convincing, than that which is offered in opposition to it.’ ” Similarly, the Supreme Court also stated in Bean v. Higgins, Inc., 230 La. 211, 88 So.2d 30, 32: “mere numerical numbers of [medical] experts is not sufficient for a determination of a decision in any case. We must take the overall picture of all the facts and circumstances * *
In my opinion, the trial court correctly applied these principles. It properly gave weight to the positive testimony of the attending physician, as well as the other surrounding circumstances. It properly discounted as virtually valueless the negative testimony of three dermatologists who saw the claimant when his symptoms were in a state of remission, after he ceased his exposure to the drilling mud; which testimony was only to the effect that these specialists themselves (not having seen the lesions during a state of exacerbation) could not corroborate the attending physician’s diagnosis of the condition as a permanent allergy— nor could they disprove it — unless they conducted certain medical tests. Interestingly enough, the defendants never tendered these tests, the only way to verify or disprove the diagnosis and prognosis of continuing disability by the attending physician, to which we shall shortly refer.
I would be the last to deny that the plaintiff’s disability could not have been better proved by more medical evidence; or that Dr. Sullivan, the attending physician, did not make as impressive a witness as he might have, due to a certain indefiniteness and hesitancy and round-about-way of speaking. Yet the full sense of this doctor’s testimony reveals -his firm belief that there was work-caused permanent allergic disability; and the question before us is, not whether the disability could have been better -proved, but simply whether it was insufficiently proven, so that the trial court fell into manifest error in accepting this testimony of the attending physician. I do not think error was committed.
The majority opinion has, probably unintentionally, completely distorted the medical evidence by the emphasis given to insignificant excerpts or facets of it, and by the majority’s failure to give any weight whatsoever to the crucial medical testimony, upon which the able trial court relied in finding that disability was definitely proved.
The crucial and the important medical testimony, which the majority lightly brushes over or discounts, is that of Dr. Sullivan, who examined and treated the claimant over a period of four months, during which time the ulcerous and inflamed condition of the sores all over the plaintiff’s shoulders, back and arms, continuing despite attempted treatment, finally brought this physician to the conclusion that the plaintiff was permanently disabled by an allergy, and that the condition was not due to a temporary irritation; which allergy resulted from repeated and sustained exposure to drilling mud in the course of his duties.
In the words of this physician, he diagnosed the cause of the claimant’s disability as “dermatoses — chronic, recurrent and circular. Chronic contact dermatoses”. Tr. 40. Also, in his words, his prognosis "based *424 on examination, evaluation and treatment of this case, [is] that occurrences and ex-acerbations will occur if patient continues in his present duty. That is, if continued exposure to offending contact agents [drilling mud] is continued”. Tr. 41.
This was this physician’s final and considered conclusion. He did also testify that he would also have preferred to verify his diagnosis absolutely by conducting further patch and other tests. As this witness testified, without contradiction in the record, “SO to 60% of the diagnosis in any event”, Tr. 48, is a based upon “observation, knowledge of the patient,” Tr. 48, and “a thorough history. It takes about five or six hours or more to take a good history in industrial dermatoses occasions”, Tr. 49.
The record reflects without any question that this Dr. Sullivan was the only physician who actually observed the type of ulcerous lesions experienced all over the plaintiff’s arms and shoulders and upper back due to his exposure to the drilling mud at work, the only one who observed their reaction to the course of treatment, and the only one qualified to diagnose the condition by actual first-hand knowledge of the history of the disease.
The majority seems to indicate that, when the claimant quit work on August 19, the rash had “cleared up” or “subsided”. At Tr. 39, where the doctor makes this statement, it will be seen that the majority takes this observation completely out of context, since what the doctor was saying was that on this examination (which was in mid-July, not on August 19), through the constant treatment of the relieving agents and by bandaging, the really skin-raw condition observed four or five days earlier on July 11th, had subsided to some extent— but this was only a temporary alleviation, brought on by the treatment and the relieving agents.
For, even with all these efforts to alleviate the pain and to cure the acute running skin ulcers, nevertheless, on August 19th (when the patient quit work because he couldn’t take it any more), this physician testified positively that, on this examination on this date, while “there was no severe inflamation, but he did have a recurrence” Tr. 43. Or, again, he testified that, on August 19th, when he examined the claimant, “at that time he did have a flare-up”, Tr. 51.
The claimant’s co-workers also testified that he quit work on August 19th because, even though he had used bandages and other protective aids, the claimant’s skin got all swollen up, with open running sores in bad condition over his arms and upper body. Tr. 150, 157.
In short, the plaintiff’s permanent allergy condition, in the words of this physician, was “chronic, progressive-chronic recurrent, with occasional exacerbation.” Tr. 37. And the record reveals that the exacerbation of which he speaks was a really excruciating experience, with painful, flowing, ulcerous sores on all the claimant’s upper extremities. This exacerbation could be brought temporarily under control by treatment, but the underlying allergy could not be cured, and the lesions reoccurred so long as the claimant was exposed to drilling mud — and, likewise, as soon as this exposure ceased, the condition became recessive, with no outward manifestations except for the scars of the past sores.
Before concluding with the subject, I should mention that Dr. Sullivan, the attending physician, although not a board dermatologist, has, according to the evidence, spent more than three years of specialized study in dermatology, as a result of which he needs only to take the board examination in order to become a certified dermatologist. Tr. 29-30. However, he said he preferred general practice to specialization, hence had not taken the board examinations. Tr. 32.
To counter this diagnosis of disability by a qualified general practitioner, the defendants rely upon the testimony of three dermatologists, who each saw the claimant once and then only briefly. Their examinations were made after the manifestations of the *425 claimant’s chronic allergy had subsided, because he was no longer' exposed to drilling mud.
The substance of each of these specialists’ testimony can be summarized as follows : When I saw the man, he only had scars of his past inflammations. Without having seen the inflammations at the time, I can not say definitely that this past disability was the result of a chronic and permanent allergy, rather than merely of a temporary reaction to irritants. Although it is true that no other member of the drilling crew may have suffered this irritation at the time, nevertheless, unless I conduct a patch test, I myself cannot definitely say now that the cause of the claimant’s disability was a permanent and chronic allergy, rather than a temporary irritation. For example, Dr. Williams frankly testified, “I can’t make any kind of a statement regarding this patient, because his skin was entirely clear by the time I saw him.” Tr. 108. Dr. Eddy also indicates his inability to make a diagnosis, not having seen the claimant when his lesions were active. Tr. 125-126 (quoted in full below).
Actually, however, the testimony of these specialists does somewhat corroborate the general practitioner’s diagnosis. It indicates that an oil worker can eventually become sensitized to drilling mud and develop an allergy to it through constant exposure to it over the years. Further, it somewhat corroborates the attending physician’s diagnosis of permanent allergic disability, instead of temporary irritation insofar as the present scars show any residual, and insofar as indicating that a physician who saw the outward manifestations at the time was indeed in a position to determine from the appearance and nature of the sores whether they represented a chronic allergic reaction (also termed a “hypersensitivity”), rather than merely a temporary irritation.
As stated by Dr. Eddy, a dermatologist testifying for the defendant, Tr. 124 — 125:
“Q. Let us assume that it was due to coming into contact with some type of drilling fluid. What would be your idea as to whether or not that condition was caused by chemical irritation as distinguished from a true case of allergy?
“A. Hypersensitivity? I don’t think that at dhis ■ particular time that you could say. The description of the lesions sounded more like a hypersensitivity rather than a pure chemical irritation. A chemical irritation when it produces breakdown of the skin will usually produce something that looks more or less like a burn. The area will be diffusely reddened or hardened. The papular nature of this thing and desiccular nature, blistering type thing, sounds a little more like sensitivity type rashes or allergic rashes, but not having seen it at the time ' and in the absence of any skin testing and in the absence of a rash in other people working at the same time, would be against the likelihood of primary irritant, like an acid, then you would expect anyone who handled it to be equally likely to get it.
“Q. What — I might be asking you to repeat yourself, but what would indicate to you that it was a primary irritant rather than an allergy?
“A. A primary irritant, [on the other hand] I would have expected to have involved everybody who was working with it. I would have expected the character of the thing to be more of a diffuse type of rash, like a scald or a burn, and I think those would be the two principle things that would make me think of primary irritation. And he should have known of the primary irritant the minute it got on him — something stung him, burned.”
*426 These medical witnesses did not indicate why the patch tests were not conducted in order to verify whether or not the claimant was indeed suffering from a permanent disabling allergy, as diagnosed by the attending physician, the only medical witness in a position to make a diagnosis.
I may say that the testimony of these three specialists, in the face of the positive diagnosis by the attending physician, is of about as much probative force as would be the testimony of carpenters or bricklayers who saw the claimant after the manifestations of the allergy subsided. Unless these specialists conducted the tests, the sole extent of their testimony is ‘T don’t know whether the claimant has a chronic and permanent disabling allergy”, just as would be the testimony of a carpenter or bricklayer who visually observed him then.
These specialists definitely do not conclude the plaintiff is not disabled by an allergy. The substance of their testimony is that they did not know whether he was so disabled, as diagnosed by the attending physician.
And yet the majority, piously and with a straight face, recites in its opinion that the “testimony” of these dermatologists is entitled to greater weight than that of the general practitioner who saw and examined and treated the claimant during his period of disability. This completely overlooks, of course, the medical evidence to the contrary in the present record, as well as the jurisprudence to the effect that the opinion of an attending physician who treats a workman is entitled to much more weight than is the testimony of a specialist who examines him only once, and then for purposes of litigation. See 19A West’s Louisiana Digest, Workmen’s Compensation, ©^14180, for the line of some thirteen or fourteen decisions to this effect.
I should also at this point describe Dr. Sullivan’s testimony a little more, for purposes of the appellate opinion. Of course, the trial court, who saw and heard him, could evaluate the personal mannerisms and timidity of this witness in expressing an opinion, which is apparent even on the face of the appellate record. (As an example, I am including as “Appendix A” of this opinion, his testimony concerning his diagnosis and prognosis.) The record is shot through with the patient encouragement by the trial' court of this witness to testify freely as to his examinations and opinions as a result thereof, since this physician, who was testifying. in court for the first time, apparently felt that he could not testify under oath except with the complete conclusiveness such as which would be expected in a scientific paper.
It is in that regard, for instance, that he said that his diagnosis was "inconclusive” unless he conducted the patch tests — he meant that he could not say beyond a reasonable doubt, i. e., could not verify beyond any doubt whatsoever, the permanent and chronic nature of the allergy without these detailed and time-consuming tests. However, under further examinations, he also indicated that it was his own firm opinion, which he was personally certain was correct, based on the actual examination of the lesions and the actual course of the condition under treatment, that the plaintiff was disabled by a permanent and chronic allergy, which would inevitably reappear upon continued exposure to drilling mud.
When this doctor stated his diagnosis was “inconclusive”, he meant only, as he later explained, that his diagnosis was “incomplete” insofar as being able to verify yet further his previous diagnosis by further medical tests, such as he would have preferred to do.
I could excerpt from the testimony of this witness, who was most reluctant to testify and who finally had to be subpoenaed from his office 200 miles distant to do so, several seeming inconsistencies; but the unmistakable sense and final considered opinion expressed by his testimony is that, based on the history and manifestations and reaction to treatment observed by him, he *427 believed the claimant to be permanently-disabled from oil field work because of a work-caused allergy to drilling mud.
The majority, incidentally, indicates that Dr. Sullivan was the claimant’s personal family physician. This physician practiced in a town approximately 200 miles distant from the plaintiff’s home town. The claimant consulted and was treated by this physician when the inflammations occurred on the drilling site some 200 miles distant from his own home. Due to this doctor’s super-caution, he never did furnish a written report of his diagnosis and prognosis, although his medical records taken down at the time reflect his definite diagnosis and prognosis of work-caused chronic allergy. (In fact, it is probable that, at the time of trial, counsel believed that the major question of this case was, not whether the claimant is entitled to workmen’s compensation for his undoubted disability, but rather whether the employer’s insurer was ar-. bitrary for failing to pay compensation when this physician gave only oral reports of the claimant’s disability to the defendants’ adjuster, without also furnishing written reports for them, despite repeated requests by both sides.)
But the refusal of this attending physician to state unqualifiedly and beyond a doubt that the claimant was permanently disabled, does not deprive the claimant of his right to receive compensation for his disability. This physician, the only medical witness in a position so to testify because the only one who actually examined and treated the lesions, did conclude that the claimant had become sensitized at work, as a result of which he had developed a chronic allergy to drilling mud, which would cause disabling manifestations to reappear upon re-exposure.
With the lack of any probative testimony to contradict this diagnosis, the plaintiff has proved his case by a preponderance of the evidence, especially in the light of all the corroborating surrounding circumstances and lay testimony. For instance, none of the plaintiff’s co-workers at the time suffered from a similar rash, and the claimant’s disability cleared up quickly as soon as his exposure to the drilling mud ceased; both of which circumstances, according to the almost undisputed medical testimony, tend to be corroborative of an allergic (permanent) condition rather than a temporary irritation.
As to the physician’s refusal to testify to his diagnosis as correct beyond a doubt (i. e., to an absolute certainty, rather than merely a legal certainty), as so well stated by Judge Cavanaugh in Sharp v. Esso Standard Oil Co., La.App. 1 Cir., 72 So.2d 601, 609-610:
“A court, in applying medical evidence to facts in a case of this kind, has to apply common sense and everyday experience to correctly resolve a situation. We know medical science knows more about these things than we do, and our experience has been, from hearing testimony of this kind, that when a doctor says ‘possible’ or ‘probable’, he does not mean that it did not happen as contended in the sense that an ordinary layman would understand his words. In giving their testimony, all medical experts try to give guarded testimony, and some courts try to draw a distinction between possibilities and probabilities. To our way of thinking and to the modern trend of the courts in considering these terms, we should look at them in a common-sense way.
“ ‘The distinction between probability and possibility should not follow too slavishly the witnesses’ choice of words, as sometimes happens in respect to medical testimony. A doctor’s use of such words as “might”, “could”, “likely”, “possible” and “may have”, coupled with other credible evidence of a non-medical character, such as a sequence of symptoms or events corroborating the opinion, is sufficient to sustain an *428 award. It is a common experience of compensation and personal injury-lawyers to find that the more distinguished a medical witness is, the more tentative and qualified are his statements on the witness stand. He will testify that the sledge-hammer blow on claimant’s head might have caused claimant’s headache, hut hesitates to say positively that this was the only possible cause, and may concede on cross-examination that there could conceivably be other causes. The weight of such testimony, however, should not be too sharply discounted because of the disposition of the highly-trained scientific mind to refrain from unqualified statements or opinions on such matters as causation.’ Larson’s Workmen’s Compensation Law, Vol. 2, § 80.32, page 322.”
I can agree with the majority that I would have preferred to see even more positive proof of the claimant’s disability before affirming. I should have preferred, for instance, that he attempt to return to work once again, despite his perseverance for four months or so under excruciatingly uncomfortable conditions due to his skin lesions, resulting from his exposure to drilling mud. But it is not I who have had the blessed relief of a cessation of the painful condition by ceasing contact with the drilling mud, and who might feel that, in view of positive medical opinion that a return to oil drilling work will bring on a recurrence of these same excruciatingly painful conditions, additional suffering might not he required of me in order to obtain compensation for my medically-diagnosed disability.
Again, I might wish that the record reflected that the claimant had had patch tests conducted by a specialist. But it is not from my pocket that these expensive and somewhat prolonged tests are to be made in a city away from my town of residence, at a time when I have no source of income.
In short, I think it is unrealistic of the majority to require the claimant to prove his case by more than a preponderance of the evidence, upon penalty of forever losing his claim for disability, simply because the majority feels that the claimant could have verified beyond a reasonable doubt the permanently disabling nature of his condition either by undergoing a painful experience or by conducting expensive experiments; the claimant’s disability is sufficiently proved by uncontradictcd (although admittedly unforceful) testimony of an attending physician well qualified to make such diagnosis.
In that regard, the thought occurs to me, why did not the defendants, with the burden of overcoming this positive diagnosis by the only physician qualified to make it on the basis of personal observations and treatment of the claimant during the objective manifestation of his disability, why did they not themselves have such tests made, as one might suppose they would have done had they felt there was any chance that these tests would have disproved the disability found by the attending physician?
At the very least, the majority should remand plaintiff’s claim for further evidence, instead of dismissing it forever. The claimant should be given an opportunity to have the clinical tests made which this court, with its too-stringent burden of proof now requires as proof of disability. Appellate courts, when they feci the evidence does not quite prove disability which may exist and which by medical tests not conducted before could have been definitely verified, sometimes, in the interests of justice and in view of the paternalistic purposes of the workmen’s compensation act, have remanded the proceedings for the purpose of permitting such medical tests to be conducted, rather than forever dismissing a possibly well-founded compensation claim by a disabled workman. Skidmore v. Drumon Fine Foods, Inc., La.App.Orh, 110 So.2d 770; McKinney v. Avondale Marine Ways Inc., La.App.Orl., 107 So.2d 835.
*429 As a matter of fact, upon the claimant’s application for rehearing, even the present majority might he willing to remand the case to prevent substantial injustice, should the facts so warrant, by application of the special paternalistic rule in workmen’s compensation cases that, to prevent a truly injured workingman from forever losing his day in court, the appeal may be remanded for further evidence, if with appropriate prayers in the application for rehearing the appellate court is presented with post-appeal medical reports indicating a continued or recurrent work-caused disability. See, e. g., Newman v. Zurich General Accident & Liability Ins. Co., La.App. 1 Cir., 87 So.2d 230; Vilce v. Travelers Ins. Co., La.App. 1 Cir., 18 So.2d 243, approved by implication in Wade v. Calcasieu Paper Company, Inc., 229 La. 702, 86 So.2d 540; Betz v. Travelers Insurance Company, La. App. 1 Cir., 68 So.2d 666; Barnes v. American Mutual Liability Insurance Company, La.App. 1 Cir., 62 So.2d 843; McClung v. Delta Shipbuilding Company, La. App., 33 So.2d 438. See also Blalphen v. St. Mary Sugar Cooperative, La.App. 1 Cir., 91 So.2d 912.
In closing, as one final indication of the somewhat illiberal approach of the majority in the review of the evidence found by the trial court to preponderate in favor of this disabled workingman’s claim, I note that the majority decree even dismisses the claim of the injured workingman for the expenses of his medical treatments during the four months in which he endeavored to continue working, although in pain and disabled by his skin condition. It is uncon-tradicted that this medical treatment was occasioned by a work-caused condition, not even the defendants contending otherwise. Yet the majority dismisses with prejudice the plaintiff’s claim for these medical expenses, with moreover the claimant to pay the entire costs of all these proceedings, despite the circumstance that the defendants undoubtedly owe these medical expenses, even if, as the majority imagines, the disability may have been temporary rather than permanent.
For the reasons above, I must dissent from this reversal of a trial court’s considered determination of disability based upon what is essentially uncontradicted medical testimony to this effect.
“Appendix A”
Excerpt from testimony of Dr. Dennis W. Sullivan, at Tr. 40-41:
“Q And what was your conclusion?
“A Do you want my final diagnosis — in other words — is that correct?
“Q Yes.
“A Include everything. * * *
“Q Without going into too much detail, Doctor. My particular question was what caused this man’s skin condition?
“A You want one cause? One cause you want?
“Q Yes, Sir.
“A That’s hard to give. No disease or condition is caused by one thing. I see what you are driving at. I just want to make myself clear. Like tuberculosis — we all have that germ in us — or have had it. We all don’t — just because we have it in us doesn’t mean we get it. There are other factors to consider, but I’ll do it the way you want it. Wo can call this dermatoses. That is spelled D-E-R-M-A-T-O-S-E-S — chronic, recurrent and circular. Chronic contact dermatoses. The skin and subcutaneous tissues of upper extremity and thorax, wrists. Treatment — exacerba-tions — and secondary inflammation, [comma] of intensely pruritic — P-E-UR-I-T-I-C nature, [comma] located — 1 gave that — secondary to — probably secondary to with that one qualification, [comma] history [you might put that in parentheses] clinical irritant of unknown nature. And I might add that —[in parentheses, offhand] — probably due to chronic prolonged exposure to contact with drilling mud. [You might put drilling mud in parentheses]. Do you want my prognosis, too — my opinion as to recurrences if he comes to

“REPORTER'S NOTE: In the above answer the remarks enclosed in brackets are what appeared to Re *430 porter to be “side” remarles. This was determined from the pauses and inflection of the voice and the nature of the remark.
“Q That’s correct.
“A The prognosis considered to be poor — ■ well, I won’t put it that way. I’ll just say it is my opinion — it is the opinion of the undersigned, based on examination, evaluation and treatment of this case, that occurrences and exacerbations will occur if patient continues in his present duty. That is, if continued exposure to offending contact agents is continued. * * * ”